**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

---

**SECURITIES AND EXCHANGE COMMISSION,**
100 F Street, NE
Washington, DC 20549

           **Plaintiff,**

    v.

**RODERIC LEE BOLING, III**
**ANNA AUGUST BOLING,**
**JEFFREY SCOTT MILLS, and**
**DIRECT RESULTS OF SWEETWATER, LLC,**

           **Defendants.**

**Jury Trial Demanded**

06 Civ. _____

---

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for its complaint against Defendants Roderic Lee Boling, III, Anna August Boling, Jeffery Scott Mills ("Mills"), and Direct Results of Sweetwater, LLC ("Direct Results") (collectively, the "Defendants"), alleges as follows:

### SUMMARY

1. This action alleges a scheme, commonly known as a "pump and dump," to defraud the public through the nationwide broadcasting of fraudulent voicemail messages touting the stocks of at least six small, thinly traded companies. In or about mid-July 2004, defendant Roderic Boling hired an Augusta, Georgia-based telemarketer ("Telemarketer") to place calls nationwide using auto-dialing technology, leaving hundreds of thousands of pre-recorded false and misleading

messages ("Fraudulent Message(s)") promoting six thinly traded stocks. The Fraudulent Messages were recorded by Roderic Boling's then wife, defendant Anna Boling. The Fraudulent Messages were intended by the Defendants and others, known and unknown, to cause each recipient of the pre-recorded message to believe that the recipient of the message had been given a "hot" stock tip intended for a friend of the caller. The messages were entirely fictitious and disseminated for the purpose of artificially inflating, or "pumping," the trading volumes and share prices of the touted companies.

2.  The scheme was designed by the Defendants and others, known and unknown, acting in concert, to enable several individuals, including defendant Mills; a group of Houston, Texas-based promoters; and a Tampa, Florida-based broker-dealer to profit by selling their shares at the fraudulently inflated prices.

3.  The calls broadcast by the Defendants accomplished their unlawful and fraudulent purpose. During the calling period, which occurred from July 25, 2004 to August 18, 2004 (the "Calling Period"), the trading volume of the touted stocks was increased by approximately 1,500% in the aggregate and the share prices of the touted stocks were increased in the combined amount of approximately $179 million in market capitalization.

## JURISDICTION AND VENUE

4.  The SEC brings this action pursuant to authority conferred by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)] seeking to permanently enjoin Defendants from engaging in the wrongful conduct alleged in this complaint. The SEC seeks a final judgment ordering Defendants to pay civil money penalties and other relief pursuant to Section 21(d) of the Exchange Act.

5.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  Defendants directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

6.     Venue lies in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of Columbia, including the dissemination of the false and misleading messages to the telephone answering machines of potential investors residing in the District of Columbia.

## DEFENDANTS

7.     Roderic Lee Boling, III, age 40, is a resident of Altamonte Springs, Florida.

8.     Anna August Boling, age 34, the former wife of Roderic Boling, is a resident of Altamonte Springs, Florida.

9.     Jeffrey Scott Mills, age 43, a resident of Longwood, Florida, is the President of Direct Results of Sweetwater, LLC.

10.    Direct Results of Sweetwater, LLC is and was, at all relevant times, a privately held company incorporated under the laws of the State of Florida with its principal place of business in Longwood, Florida.  The company is controlled by Jeffrey Mills.

**RELEVANT ENTITIES**

11.     American Multiplexer Corp. ("AMUT") is and was, at all relevant times, a data distribution and compression provider incorporated under the laws of the State of North Carolina with its principal place of business in Sunnyvale, California.  Until December 20, 2004, AMUT's common stock was quoted in the Pink Sheets, a price quotation system primarily used for quotations for securities of small corporations that do not meet the minimum listing requirements of a registered exchange.  It was quoted under the symbol AMUT until December 20, 2004, when the SEC revoked the registration of AMUT's securities pursuant to Section 12(j) of the Exchange Act.

12.     Donini, Inc. ("DNNI") is and was, at all relevant times, a pizzeria franchise management company incorporated under the laws of the State of New Jersey with its principal place of business in Montreal, Canada.  DNNI's common stock is quoted on the OTC Bulletin Board, a price quotation system primarily used for quotations for securities of small corporations that do not meet the minimum listing requirements of a registered exchange.  It is quoted under the symbol DNNI.

13.     5G Wireless Communications, Inc. ("FGWC") is and was, at all relevant times, a wireless broadband retailer incorporated under the laws of the State of Nevada with its principal place of business in Marina Del Rey, California.  FGWC's common stock is quoted on the OTC Bulletin Board.  Until November 22, 2005, it was quoted under the symbol FGWC.  It is currently quoted under the symbol FGWI.

14.     Innovative Food Holdings, Inc. ("IVFH") is and was, at all relevant times, a restaurant supply distributor incorporated under the laws of the State of Florida with its principal place of

business in Naples, Florida. IVFH common stock is quoted in the Pink Sheets under the symbol IVFH.

15. Maui General Store, Inc. ("MAUG") is and was, at all relevant times, an Internet and mail-order catalog retailer incorporated under the laws of the State of New York with its principal place of business in Hana, Hawaii. MAUG's common stock is quoted on the OTC Bulletin Board under the symbol MAUG.

16. Power3 Medical Products, Inc. ("PWRM") is and was, at all relevant times, a specialty healthcare and biotechnology holding company incorporated under the laws of the State of New York with its principal place of business in The Woodlands, Texas. PWRM's common stock was quoted on the OTC Bulletin Board until approximately June 20, 2005, when it became ineligible for quotation on the Bulletin Board. Since that time, PWRM's common stock has been quoted in the Pink Sheets under the symbol PWRM.

## THE SCHEME TO DEFRAUD

17. In or about mid-July 2004, defendant Roderic Boling contacted an Augusta, Georgia-based telemarketer ("Telemarketer") to engage his services to broadcast voicemail messages touting several stocks. Roderic Boling specified requirements for the voicemail campaign, including that the messages never be sent to the same number twice, that the recorded tout only be played to an answering machine or voicemail system, and that knowledge of the voicemail campaign be kept to a minimum among the Telemarketer's employees.

18. In or about July 25 through August 18, 2004 (the "Calling Period"), at the direction of Roderic Boling, the Telemarketer broadcast Fraudulent Messages intended to deceive investors nationwide into believing that they had inadvertently been made privy to a confidential stock tip

about MAUG, IVFH, FGWC, PWRM, DNNI and/or, AMUT.  The messages were recorded over the phone by Roderic Boling's then wife, defendant Anna Boling, from the Altamonte Springs, Florida home in which she resided with her then husband.

19.     On or about August 19, 2004, after news of the Fraudulent Messages had spread on internet message boards, Roderic Boling asked the Telemarketer to continue broadcasting the Fraudulent Messages.  The Telemarketer refused.  In response, Boling instructed the Telemarketer to delete all of the files related to the voicemail campaign from the Telemarketer's computers, including stored copies of the Fraudulent Messages.  The Telemarketer subsequently stopped broadcasting the Fraudulent Messages.

20.     On or about August 31, 2004, Roderic Boling, the Telemarketer and Mills traveled together to a Gulfport, Mississippi casino.  Mills and Roderic Boling planned to collect payment for the Fraudulent Messages while at the casino, and to pay the Telemarketer for his services.  Once at the casino, Mills retrieved a blue duffel bag filled with cash, which he gave to Roderic Boling.  Roderic Boling, in turn, over the course of their stay, gave the Telemarketer approximately $40,000 taken from the bag.

**The MAUG Fraudulent Messages**

21.      On or about July 25, 28, August 1, 3 and 6, 2004 and other dates unknown, in furtherance of the scheme to defraud, Roderic Boling directed the Telemarketer to broadcast a series of Fraudulent Messages that had been recorded by Anna Boling and that were intended to deceive investors nationwide into believing that they had received an inside stock tip about MAUG.  The Telemarketer placed the following or a substantially similar Fraudulent Message on telephone answering machines across the country:

6

> Hey Tracy, it's Debbie! I couldn't find your old number and Tammy said this was your new one – I hope it's the right one. Anyway, remember Evan, that hot stock exchange guy I'm dating? He gave my dad that stock tip on WLSF and it went from under a buck to like three bucks in two weeks and you were mad I didn't call you? Well I'm calling you now. This new company is supposed to be like the next Tommy Bahama and they're making some big news announcement this week. The stock symbol is MAUG. He said it's cheap now, like $.50. Sorry I'm eating but I'm starving. It's $.50 now and it's going up to, like, 5 or 6 bucks this week, so get as much as you can. Call me on my cell – I'm still in Orlando. It's 407-XXX-XXXX. Dad and I are buying a bunch tomorrow and I already called Kelly and Ron, too. Anyway, I miss you. Give me a call. Bye.

22.     The Fraudulent Messages had their intended effect of increasing the trading volume and share price of MAUG stock. The price of MAUG stock was $.40 per share on July 23, 2004, before the messages were broadcast. During the Calling Period the price spiked to a high of $1.15 per share on August 6, 2004, while the messages were being broadcast. During the Calling Period the trading volume of MAUG stock also spiked, increasing from 7,125 shares traded on July 23 to 615,010 shares traded on August 6. The spike in the price of MAUG stock amounted to an approximately $100.1 million inflation of the company's market capitalization.

23.     In the summer of 2004, prior to the broadcasting of the MAUG Fraudulent Messages, defendant Mills had agreed with another Florida-based stock promoter ("Florida Promoter") to promote MAUG in exchange for which the Florida Promoter would pay Mills a portion of the proceeds he realized from selling MAUG shares during the promotion. Between July 26 and August 9, 2004, while the MAUG messages were being broadcast, the Florida Promoter sold 421,600 shares of MAUG, obtaining proceeds of $315,913. On or about August 3, 2004, and August 6, 2004, Mills deposited checks from the Florida Promoter totaling $25,233, representing his share of the proceeds from those sales. The checks were made out to Mills' company, defendant Direct Results of Sweetwater, and were deposited into a bank account in the name of Direct Results.

**The IVFH Fraudulent Messages**

24.     On or about August 6, 8, 10, 11, 12 and 14, 2004 and other dates unknown, in furtherance of the scheme to defraud, Roderic Boling directed the Telemarketer to broadcast a series of Fraudulent Messages that had been recorded by Anna Boling and that were intended to deceive investors nationwide into believing that they had received an inside stock tip about IVFH. The Telemarketer placed the following or a substantially similar Fraudulent Message on telephone answering machines across the country:

> Hey Pam, it's Renee.  I lost your old number and Tammy said this was your new one – I hope it's the right one.  Anyway, remember Scott, that hot stock exchange guy I'm dating?  And remember when he gave my dad that stock tip in June on SMSI and it went from a buck to like five bucks in two weeks and you were mad because I didn't call you about it?  Well I'm calling you now.  There's this new company that just signed a big food deal with Emeril, you know, the TV chef, and they're making a big announcement this week.  Anyway, the stock symbol is IVFH.  He said it's cheap now, like $0.25, but after this weekend it's going to be taking off, so get as much as you can.  Call me on my cell phone, ok?  I'm still in Orlando.  It's 407-XXX-XXXX.  And, uh, my Dad and I are gonna be buying a bunch and I called Kelly and Ron, too.  Anyway, give me a call. I miss you.  Bye.

25.     The Fraudulent Messages had their intended effect of increasing the trading volume and share price of IVFH stock.  The price of IVFH stock was $.25 per share on August 4, 2004, before the messages were broadcast.  During the Calling Period the price spiked to a high of $.48 per share on August 13, 2004, while the messages were being broadcast.  During the Calling Period the trading volume of IVFH stock also spiked, increasing from 80,500 shares traded on August 4 to 3,275,711 shares traded on August 13.  The spike in the price of IVFH stock amounted to an approximately $8.4 million inflation of the company's market capitalization.

26.     On or about August 5, 2004, a California-based promoter, who had been hired to facilitate public relations for IVFH via promotional faxes and emails, transferred 250,000 shares of IVFH to Direct Results.  Between August 12 and August 16, while the Fraudulent Messages were being broadcast, Mills sold 220,000 of those shares, generating proceeds of $86,750.

**The FGWC Fraudulent Messages**

27.     On or about August 13, 14 and 16, 2004 and other dates unknown, in furtherance of the scheme to defraud, Roderic Boling directed the Telemarketer to broadcast a series of Fraudulent Messages that had been recorded by Anna Boling and that were intended to deceive investors nationwide into believing that they had received an inside stock tip about FGWC.  The Telemarketer placed the following or a substantially similar Fraudulent Message on telephone answering machines across the country

> Hey Patty, it's Lisa, um, I can't find that number you gave me and I asked Jessica and she said this was your new one so I hope it's the right one.  Anyway, remember Matt, that hot stock exchange guy I'm dating, remember when he gave my dad that stock tip in June on SMSI and it went from a buck to like five bucks in two weeks.  You were mad because I didn't call you about it, well, I'm calling you now 'cause there's this new company, it's some wireless internet provider, whatever that is, and someone may be trying to buy it or sell it; it's kind of confusing.  But, anyway, it's going up big this week – some big internet deal—and the stock symbol is FGWC.  He said it's open cheap, under 10 cents—sorry, I'm eating 'cause I'm starving—anyway, it's under 10 cents now, but it's going to a buck or so, so get as much as you can.  Give me a call on my cell; I'm still in New York.  Uh, my dad and I are going to be buying a bunch, and I only told Sam and Ellen about it, besides you now, because it's kind of a secret.  Anyways, call me or e-mail me.  Love you, bye.

28.     The Fraudulent Messages had their intended effect of increasing the trading volume and share price of FGWC stock.  The price of FGWC stock was $.018 per share on August 11, 2004, before the messages were broadcast.  During the Calling Period the price spiked to a high of $.029

9

per share on August 16, 2004, while the messages were being broadcast. During the Calling Period the trading volume of FGWC stock also spiked, increasing from 783,043 shares traded on August 11 to 20,412,952 shares traded on August 16. The spike in the price of FGWC stock amounted to an approximately $3.4 million inflation of the company's market capitalization.

### The PWRM Fraudulent Messages

29.  On or about August 11, 12, 13, 14, 15, 16, 17 and 18, 2004 and other dates unknown, in furtherance of the scheme to defraud, Roderic Boling directed the Telemarketer to broadcast a series of Fraudulent Messages that had been recorded by Anna Boling and that were intended to deceive investors nationwide into believing that they had received an inside stock tip about PWRM. The Telemarketer placed the following or a substantially similar Fraudulent Message on telephone answering machines across the country:

> Hey Steph, it's Wendy. I looked for your old number and I couldn't find it but Brady says this is your new one I hope it's the right one. Anyway, remember Evan that hot stock exchange guy I'm dating—he gave my dad that hot stock tip in June on SMSI and it went from a buck to like five bucks in two weeks and you were mad because I didn't call you? Well, I'm calling you now. There's this new company that supposedly developed some zillion dollar cancer test thing and it's going to go up big this week—some patent thing, whatever that is. Anyway, the stock symbol is PWRM, and he says it's gonna open cheap, like $2.50—I'm sorry, I'm eating 'cause I'm starving—it's $2.50 now and it's going to take off after this weekend so get as much as you can. Call me on my cell phone, okay; I'm still in New York. Um, my dad and I are going to be buying a bunch tomorrow and the only people I told is Sam and Ellen—it's kind of a secret. Okay, so give me a call or e-mail me. I love you. Bye.

30.  The Fraudulent Messages had their intended effect of increasing the trading volume and share price of PWRM stock. The price of PWRM stock was $2.52 per share on August 6, 2004, before the messages were broadcast. During the Calling Period the price spiked to a high of $4.38

per share on August 17, 2004, while the messages were being broadcast. During the Calling Period the trading volume of PWRM stock also spiked, increasing from 766,628 shares traded on August 6 to 5,695,178 shares traded on August 17. The spike in the price of PWRM stock amounted to an approximately $63.6 million inflation of the company's market capitalization.

### The DNNI Fraudulent Messages

31.     On or about August 13 and 14, 2004 and other dates unknown, in furtherance of the scheme to defraud, Roderic Boling directed the Telemarketer to broadcast a series of Fraudulent Messages that had been recorded by Anna Boling and that were intended to deceive investors nationwide into believing that they had received an inside stock tip about DNNI. The Telemarketer placed the following or a substantially similar Fraudulent Message on telephone answering machines across the country:

> Hey Jen, it's Tara. I couldn't find the number you gave me and Sandy said this was your new one, so I hope it is the right one. Anyway, remember Chet, that hot stock exchange guy I'm dating? Remember when he gave my Dad that stock tip in June on SMSI and it went from a buck to like five bucks in two weeks and you were mad because I didn't call you about it? Well I'm calling you now, because there is this new company and it's supposed to be like the next Carrabba's and it is going up big this week some big food deal. Anyway the stock symbol is DNNI and he said it opens cheap, like $.20. I'm sorry I'm eating because I'm starving right now. It's $.20 and it's going up to a couple of bucks or something, so get as much as you can. Call me on my cell, I'm still in New York. Um, my Dad and I are gonna be buying a bunch tomorrow and I only told Sam and Ellen about it because it is kind of a secret. Anyway, call me or email me. Love you, bye.

32.     The Fraudulent Messages had their intended effect of increasing the trading volume and share price of DNNI stock. The price of DNNI stock was $.10 per share on August 11, 2004, before the messages were broadcast. During the Calling Period the price spiked to a high of $.30

per share on August 16, 2004, while the messages were being broadcast. During the Calling Period the trading volume of DNNI stock also spiked, increasing from 5,250 shares traded on August 11 to 3,179,152 shares traded on August 16. The spike in the price of DNNI stock amounted to an approximately $2.4 million inflation of the company's market capitalization.

**The AMUT Fraudulent Messages**

33. On or about August 17 and 18, 2004 and other dates unknown, in furtherance of the scheme to defraud, Roderic Boling directed the Telemarketer to broadcast a series of Fraudulent Messages that had been recorded by Anna Boling and that were intended to deceive investors nationwide into believing that they had received an inside stock tip about AMUT. The Telemarketer placed the following or a substantially similar Fraudulent Message on telephone answering machines across the country:

> Hey Jen, it's Tiffany. I couldn't find that number you gave me, but Tina said this is your new one, so I hope I'm calling you at the right one. Anyway, remember Mike, that hot stock exchange guy I date sometimes? Remember when he gave my Dad that stock tip in March last year on TIWI - it was that internet phone/international phone thing - whatever it was. Anyway it went from like a buck to fifteen bucks and you were so mad at me because I didn't call you about it. Well, I'm calling you now because he just told me about this other company, and they're gonna be bought out next week or something, and they're gonna be making a big announcement about it. Anyway the stock symbol is AMUT and he said it is cheap now, like $.10, but it is gonna be taking off this week, so go ahead and get as much as you can. Anyway, call me on my cell - I'm still in New York and its 917-XXX-XXXX. Um, my Dad and I are gonna be buying a whole bunch of it and I already told Tina and Bob about it too. I just wanted to let you know. Give me a call, ok? Miss you. Bye.

34. The Fraudulent Messages had their intended effect of increasing the trading volume and share price of AMUT stock. The price of AMUT stock was $.10 per share on August 16, 2004,

before the messages were broadcast. The price spiked to a high of $.17 per share on August 19, 2004, just after the messages had been broadcast. During the same period, the trading volume of AMUT stock also spiked, increasing from 35,500 shares traded on August 16 to 1,725,858 shares traded on August 19. The spike in the price of AMUT stock amounted to an approximately $1.7 million inflation of the company's market capitalization.

**FIRST CLAIM FOR RELIEF**
**(All Defendants)**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

35. The Commission realleges and incorporates by reference herein the averments of paragraphs 1 through 34 of the Complaint.

36. Defendants have, by engaging in the conduct set forth above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with intent to defraud or reckless disregard for the truth: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons, in connection with the purchase or sale of securities.

37. Roderic Boling, Anna Boling, Jeffrey Mills, and Direct Results of Sweetwater, LLC, by engaging in the conduct set forth above, knowingly or recklessly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**(Defendant Anna Boling)**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 thereunder**

38. The Commission realleges and incorporates by reference herein the averments of paragraphs 1 through 34 of the Complaint.

39. Roderic Boling, Jeffrey Mills, and Direct Results of Sweetwater, LLC, by engaging in the conduct set forth above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, have with intent to defraud or with reckless disregard for the truth: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons, in connection with the purchase or sale of securities.

40. Anna Boling, by engaging in the conduct set forth above, knowingly provided substantial assistance to Roderic Boling, Jeffrey Mills and Direct Results of Sweetwater, LLC in their violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

41. Based on the foregoing, Anna Boling aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff SEC respectfully requests that this Court enter final judgments:

I.  Permanently enjoining each of the Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

II.  Permanently enjoining defendant Anna Boling, her agents, servants, employees, attorneys, and all persons in active concert or participation with her who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

III.  Ordering each of the Defendants to disgorge their ill-gotten gains, as well as prejudgment interest thereon;

IV.  Ordering each of the Defendants to pay the maximum civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act; and

V.  Granting such other and further relief as the Court deems appropriate.

Dated: July 25, 2006

By: /s/ Alan M. Lieberman
Alan M. Lieberman,
Assistant Chief Litigation Counsel
John Reed Stark (DC Bar # 425187)
Thomas A. Sporkin (DC Bar # 444865)
David C. Rice
Andrea Bellaire
Attorneys For Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
(202) 551-4474