# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION, :

                Plaintiff,        :

            v.            :  Case No. 1:06CV01329 (RMC)

RODERIC LEE BOLING III,     :
ANNA AUGUST BOLING,      :
JEFFREY SCOTT MILLS, and    :
DIRECT RESULTS OF SWEETWATER, LLC  :

          Defendants.   :

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS ANNA AUGUST BOLING, JEFFREY SCOTT MILLS AND DIRECT RESULTS OF SWEETWATER, LLC.

Plaintiff Securities and Exchange Commission ("Plaintiff") hereby moves this Court pursuant to Fed. R. Civ. P. 56(a) of the Federal Rules of Civil Procedure, for an order granting summary judgment against defendants Anna August Boling, Jeffrey Scott Mills and Direct Results of Sweetwater, LLC, (collectively refereed to as the "Defendants") and granting injunctive relief, disgorgement of ill-gotten gains, prejudgment interest and civil penalties.

This motion is supported by the Memorandum of Points and Authorities in Support of Motion for Summary Judgment as to Defendants, Plaintiff's Statement of Facts Not in Issue Pursuant to Local Civil Rule 56.1(a), the Declaration of Andrea Bellaire dated January 29, 2008 and the exhibits attached thereto. A proposed Final Judgment against the Defendants is also submitted herewith.

Dated: January 29, 2008
      Washington, DC

                Respectfully Submitted,

                /s/ Alan M. Lieberman

                _____

                Alan M. Lieberman
                Andrea Bellaire
                Attorneys for Plaintiff
                U.S. Securities and Exchange Commission
                100 F Street, NE
                Washington, DC 20549
                202.551.4474 (Lieberman)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION, :

        Plaintiff,             :

          v.                :    Case No. 1:06CV01329 (RMC)

RODERIC LEE BOLING III,        :
ANNA AUGUST BOLING,
JEFFREY SCOTT MILLS, and       :
DIRECT RESULTS OF SWEETWATER, LLC

             :

        Defendants.     :

---

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS ANNA AUGUST BOLING, JEFFREY SCOTT MILLS AND DIRECT RESULTS OF SWEETWATER, LLC.

Defendants Anna August Boling ("A. Boling"), Jeffrey Scott Mills ("Mills") and Direct Results of Sweetwater, LLC, ("Direct Results") (collectively referred to as the "Defendants"), conspired in a fraud leading to significant financial losses and disruption of the U.S. financial markets. This scheme to defraud drove up the price and demand of shares of stock through the nationwide dissemination of tens of thousands of fraudulent voicemail messages. Mills and co-defendant Roderic Lee Boling (R. Boling) created the messages which were recorded by A. Boling and intended to make each recipient believe the caller had misdialed when calling a friend to pass along a hot stock tip. Innocent investors were induced to purchase shares of the stocks by the deceitful messages, while unknown to the victims, Defendants and others involved in the scheme profited by selling their shares of the stocks, as their victims bought. Mills, as architect of this "pump and

dump" scheme, organized, facilitated and supervised all aspects of the fraud. In a related criminal action, Defendants and R. Boling pled guilty before the Honorable Ellen Segal Huvelle to the core conducted described herein.

## I.    PERTINENT PROCEDURAL HISTORY

The Plaintiff filed its Complaint (the "Complaint") in this action on July 27, 2006. Service of the Complaint was made on A. Boling, Mills and Direct Results within the provisions of Federal Rule of Civil Procedure 4(d) and the District of Columbia's personal jurisdiction statute. (Civil Docket Numbers 3-4, 6). On December 22, 2006, the Court granted A. Boling's motion for an extension of time to answer the Complaint and set a filing deadline of January 19, 2007. On January 18, A. Boling filed an unsigned answer to the Complaint and on January 26, she filed an executed answer. (Civil Docket Numbers 12, 15).

On December 28, 2006, Mills filed a motion to dismiss the Complaint, which the Court denied on July 13, 2007. (Civil Docket Numbers 8, 19). Mills and Direct Results have not filed an answer to the Complaint as required by Fed. R. Civ. P. 12.[1] Defendant R. Boling also failed to file an answer to the Complaint. On October 19, 2007, the Plaintiff filed a motion for default judgment against him. (Civil Docket Number 24). The Court ordered R. Boling to show cause by November 26, 2007, why the Court should not grant this motion. (Civil Docket Number 25). R. Boling did not respond to this order. On January 14, 2008, the Court filed a Modified Order of Final Judgment by Default against R. Boling. (Civil Docket Number 30).

---

[1] Settlement negotiations with Mills' lawyer began well after the 10-day period Mills had to file an answer to the Complaint. The negotiations have proven unsuccessful.

The Plaintiff's Complaint was filed contemporaneously with the indictments of the Defendants in a related criminal matter, <u>United States of America v. Jeffrey S. Mills, Roderic L. Boling and Anna Boling,</u> 06CR228 (ESH) (July 27, 2006), (the "Criminal Action"). (Civil Docket Number 1 and Criminal Action Docket Number 1). On July 3, 2007, the Defendants pled guilty before the Honorable Ellen Segal Huvelle to the same core allegations of Plaintiff's Complaint. (Ex. 1 Criminal Action Plea Transcript at 39, 52-53).

A. Boling pled guilty to Misprision of a Felony (Securities Fraud) in violation of 18 U.S.C. § 4, and 15 U.S.C. § 78j(b) and 78ff. (Ex. 2 A. Boling Statement of Offense at 1 and Ex. 3 A. Boling Plea Agreement at 2). Mills pled guilty to Conspiracy to Commit Securities Fraud and Wire Fraud in violation of 18 U.S.C. § 371, and Securities Fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff. (Ex. 4 Mills Statement of Offense at 1 and Ex. 5 Mills Plea Agreement at 1). On July 5, 2007, the Defendants' Plea Agreements and Statements of Offense were entered by the Court. (Criminal Action Docket Numbers 131, 133, 137-138).

## II.    STATEMENT OF UNDISPUTED FACTS

The pertinent facts are fully set forth in Plaintiff's Statement accompanying this motion, and summarized below.[2]

### A.    The Fraudulent Scheme

Defendants, together with co-defendant R. Boling, engaged in a "pump and dump" scheme to defraud the public through the nationwide broadcasting of fraudulent voicemail messages (the "Fraudulent Messages") touting stocks. (Bellaire Decl. Ex. 1

---

[2] All Exhibits referred to herein are attached to the Facts Not in Issue Pursuant to Local Civil Rule 56.1(a) ("Plaintiff's Statement") and the Declaration of Andrea Bellaire dated January 25, 2008 ("Bellaire Decl.").

Transcribed Fraudulent Messages).  The Fraudulent Messages were intended to cause each recipient of a pre-recorded message to believe that he had been mistakenly given a "hot" stock tip intended for a friend of the caller.  (Ex. 2 A. Boling Statement of Offense at 2 and Ex. 4 Mills Statement of Offense at 1-2).

The scheme was designed to artificially inflate the price and demand of the following companies' stock to induce investors to purchase shares of the stock: American Multiplexer Corp. ("AMUT"), Donini, Inc ("DNNI"), 5G Wireless Communications, Inc. ("FGWC"), Innovative Food Holdings, Inc. ("IVFH"), Maui General Store, Inc. ("MAUG), and Power3 Medical Products, Inc. ("PWRM") (the "Stocks").  (Ex. 2 A. Boling Statement of Offense at 1 and Ex. 4 Mills Statement of Offense at 1).[3]

The Fraudulent Messages were distributed to the answering machines and voicemail systems of tens of thousands of persons to enable Mills and other insiders to profit by selling shares of the touted stocks at the fraudulently inflated prices.  (Ex. 4 Mills Statement of Offense at 2, 6, 8, 10, 12).  The trading volume of the touted stocks was increased by approximately 1,500% in the aggregate and the share prices of the touted stocks were increased in the combined amount of approximately $179 million in market capitalization.  (Plaintiff's Statement at ¶10).

**B.     Mills' Role in the Scheme**

Mills was the organizer, manager, leader and supervisor of the Fraudulent Message scheme.  (Ex. 4 Mills Statement of Offense at 3).  Specifically, in July and August 2004, Mills was hired to promote five of the six Stocks in return for stock or

---

[3] AMUT is not included in the Criminal Action.

cash or both. (Ex. 4 Mills Statement of Offense at 5). Mills recruited R. Boling to participate in the fraudulent scheme. (Ex. 4 Mills Statement of Offense at 5). Both knew that individuals who had hired them to promote the Stocks planned to sell large amounts of the Stock into the market during the time that Mills and R. Boling were going to flood the public with Fraudulent Messages. (Ex. 4 Mills Statement of Offense at 6).

Mills and R. Boling created the scripts for the Fraudulent Messages with the intent of fraudulently inducing prospective investors to purchase touted Stocks at inflated prices. (Ex. 4 Mills Statement of Offense at 2). Mills directed R. Boling to have a woman record the Fraudulent Messages. (Ex. 4 Mills Statements of Offense at 6, 8, 9-10).

### C.     A. Boling's Role in the Scheme

R. Boling in turn directed his wife to record the Fraudulent Messages. A. Boling recorded at least 26 different Fraudulent Messages. (Ex. 2 A. Boling Statement of Offense at 6). She knew the scripted messages contained material misrepresentations and falsehoods and would be distributed to hundreds of thousands of households. (Ex. 2 A. Boling Statement of Offense at 2, 6). A. Boling created the belief in the recipients that they had received a voicemail message mistakenly dialed to their phone. (Ex. 2 A. Boling Statement of Offense at 2).

A. Boling used a false name in each of the Fraudulent Messages and misrepresented that the cellular phone numbers were her own. (Ex. 2 A. Boling Statement of Offense at 12). A. Boling knew the cellular phone numbers she left in the Fraudulent Messages were to pre-paid disposable cellular telephones ("Disposable

Phones"). (Ex. 2 A. Boling Statement of Offense at 12). The Disposable Phones were purchased by Mills.[4] (Ex. 4 Mills Statement of Offense at 7-8). A. Boling knew R. Boling and Mills, or others involved in the fraudulent scheme were monitoring the call volume on the Disposable Phones. (Ex. 2 A. Boling Statement of Offense at 12). A. Boling knew R. Boling was hired by Mills to promote the Fraudulent Messages and that her then-husband and sole financial provider, R. Boling, would be compensated for his role in the scheme. (Ex. 2 A. Boling Statement of Offense at 2).

A. Boling coached her relatives to provide false information to the grand jury. A. Boling believing that her mother and sister would be questioned before the grand jury regarding whether they were able to identify her voice on the Fraudulent Messages, played one of the Fraudulent Messages for them and told them that she did not record the Fraudulent Messages. (Ex. 2 A. Boling Statement of Offense at 13-14).

**D.     The Ill-gotten Gains**

Mills received a total of approximately $111,983 in proceeds for his role in the scheme. This total comprised 250,000 shares of IVFH stock received from an insider as payment for Mills' role in the scheme. (Ex. 4 Mills Statement of Offense at 2 and Bellaire Decl. Ex. 2 Letter Instructing Transfer of IVFH Shares to Direct Results). During the time the Fraudulent Messages touting IVFH stock were broadcast Mills sold 220,000 IVFH shares at inflated prices. (Ex. 4 Mills Statement of Offense at 2). Mills generated proceeds of $86,750 from these sales. (Bellaire Decl. Ex. 3 Direct Results' SunState Equity Trading, Inc. Account Statement and Bellaire Decl. Ex. 4 Chart summarizing these transactions). Mills also received two checks totaling $25,233 on

---

[4] After Mills' home was searched by the criminal authorities, Mills, R. Boling and other insiders bought additional Disposable Phones to protect their phone communications with each other from detection. (Ex. 4 Mills Statement of Offense at 11).

August 2, 2004 and August 6, 2004, in proceeds from the sale of MAUG shares during the time period that investors were fraudulently induced to purchase MAUG stock. (Ex. 4 Mills Statement of Offense at 2; Bellaire Decl. Ex. 5 Direct Results' SunTrust Bank Account Statement; and Bellaire Decl. Ex. 6 Checks in the amount of $9,833 and $15,400 for a total of $25,233).

After the Fraudulent Messages had been broadcast, Mills, R. Boling, and the telemarketer, who was hired by R. Boling to broadcast the Fraudulent Messages, traveled to a, Gulfport, Mississippi casino to collect payment for their involvement in the scheme.   Mills met an insider who hired him to promote PWRM in the casino parking lot where he received $100,000.  Mills put the $100,000 in a duffle bag and thereafter gave the bag containing the $100,000 to R. Boling.  R. Boling took $10,000 from the bag, which he gave to the telemarketer; he also gave the telemarketer several thousand dollars worth of chips.  The next day, R. Boling gave the telemarketer additional cash, and kept in excess of $35,000 for himself.  (Ex. 4 Mills Statement of Offense at 11). The telemarketer received a total of approximately $40,000 from R. Boling which has been disgorged by the telemarketer in his settlement with the Plaintiff.[5]

## III.    ARGUMENT

Summary judgment should be granted when there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  When the moving party has demonstrated that there are no issues of fact in dispute, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading" and

---

[5] SEC v. Michael O'Grady, et al., 05CV00868 (RJL) (D.D.C., May 3, 2005).  The telemarketer also pled guilty to obstruction of justice charges stemming from the fraudulent scheme. United States of America v. Michael O'Grady, 05CR119 (ESH) (D.D.C., May 3, 2005).

must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The evidence summarized above demonstrates that there is no genuine issue as to any material fact and that the Plaintiff is entitled to judgment against the Defendants as a matter of law.

### A. Defendants Are Estopped from Contesting the Conduct to Which They Pled Guilty

Defendants pled guilty in the Criminal Action to the core conduct alleged in the Plaintiff's complaint and are collaterally estopped from contesting the facts underpinning their convictions. Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568 (1951); SEC v. Bilzerian, 29 F.3d 689, 693-94 (D.C. Cir. 1994).

In SEC v. Bilzerian, defendant faced civil claims and criminal charges stemming from the same underlying alleged violations of the federal securities laws. SEC v. Bilzerian, supra, 29 F.3d at 692. The Court affirmed the district court's decision granting the SEC's motion, finding "that Bilzerian was collaterally estopped from contesting the facts set forth in support of the SEC's civil claims because the same facts formed the basis of his criminal conviction," id. at 693.

Courts in this circuit have long held that defendants are collaterally estopped from disputing the facts underlying a guilty plea. E.g., United States v. Information Planning Assoc., Inc., 1986 WL 74353, *1 (D.D.C. Sept. 8, 1986) ("A prior criminal conviction, including a guilty plea, does have issue preclusive effect in the Government's favor in a subsequent civil proceeding . . . .") (citing Emich Motors, supra, 340 U.S. at 569); Alsco-Harvard Fraud Litig., 523 F. Supp. 790, 802 (D.D.C. 1981) ("[W]ell-established

- 8 -

principles of federal law hold that guilty pleas collaterally estop the future civil

adjudication of issues necessarily admitted to by the plea."); Firestone Tire & Rubber Co.

v. Dep't of Justice, 1981 WL 1870, *4 n.10 (D.D.C. Aug. 20, 1981); In re Spicer, 155

B.R. 795, 804 (Bankr. D.D.C. 1993) ("A conviction or guilty plea can form the basis for

collateral estoppel."). And see In re Raiford, 695 F.2d 521, 523 (11th Cir. 1983); United

States v. Podell, 572 F.2d 31, 35 (2d Cir. 1978); Ivers v. United States, 581 F.2d 1362,

1367 (9th Cir. 1978); Hernandez-Uribe v. United States, 515 F.2d 20, 21 (8th Cir. 1975);

Plunkett v. Comm'r of Internal Revenue, 465 F.2d 299, 304-06 (7th Cir. 1972); Metros v.

U.S. District Court, 441 F.2d 313, 317 (10th Cir. 1971); United States v. Accardo, 113 F.

Supp. 783, 786 (D.N.J. 1953), aff'd 208 F.2d 632 (3d Cir. 1953) (per curiam).

The estoppel extends "to questions 'directly put at issue and directly determined'

in the criminal prosecution." United States v. Uzzell, 648 F. Supp. 1362, 1364 (D.D.C.

1986) (quoting Emich Motors, supra, 340 U.S. at 569). In this case, the facts necessary

to determine the claim of securities fraud in favor of the Plaintiff were determined in the

Criminal Action. The factual bases for the defendants' pleas involve the identical

conduct at issue alleged by the Plaintiff in its civil Complaint. (Ex. 2 A. Boling

Statement of Offense at 1; Ex. 3 A. Boling Plea Agreement at 2; Ex. 4 Mills Statement of

Offense at 1; and Ex. 5 Mills Plea Agreement at 1). The defendants' guilty pleas prohibit

them from contesting the conduct set forth in the Plaintiff's Complaint and the

Defendants are collaterally estopped from relitigating the facts of the fraud.

### B. Defendants Admitted to Violating Section 10(b) and Rule 10b-5

The Plaintiff's Complaint alleges violations of Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5 ]. To establish

liability under these provisions, the Plaintiff must show that the Defendants engaged in:
(1) misrepresentations or omissions of material facts; (2) made in connection with the
offer, sale or purchase of securities; and (3) with scienter. Ernst & Ernst v. Hochfelder,
425 U.S. 185 (1976). The Plaintiff's Complaint alleges the same conduct of which
Defendants were convicted, namely that the Defendants intentionally made material
misstatements to prospective investors regarding the expected performance of various
stocks. (Ex. 2 A. Boling Statement of Offense at 1; Ex. 3 A. Boling Plea Agreement at
2; Ex. 4 Mills Statement of Offense at 1; and Ex. 5 Mills Plea Agreement at 1).
Therefore, the Defendants are liable under Section 10(b) and Rule 10b-5.

 *1. Defendants' Voicemails Contained Material Misstatements and Omissions*

 Statements and omissions are material if a reasonable investor would consider
them important to an investment decision, and would view it as having significantly
altered the total mix of available information. Basic Inc. v. Levinson, 485 U.S. 224,
231-32 (1998); SEC v Int'l Loan Network, 770 F. Supp. 678, 694 (D.D.C. 1991), aff'd,
968 F.2d 1304 (D.C. Cir. 1992). Projections about a company's imminent success are
important to an investment decision. The Fraudulent Messages contained such
projections, but failed to disclose the following material facts: (1) that A. Boling did not
have genuine information about the Stocks; (2) that her then-husband was paid to find a
telemarketer to broadcast the Fraudulent Messages; (3) that the price of the Stocks would
significantly rise due to the artificial demand created by the Fraudulent Messages; and
(4) that individuals involved in the scheme would profit by selling their shares of the
Stocks at the artificially inflated prices. Both Mills and A. Boling admitted that the
statements made to justify the positive predictions about the companies touted in the

Fraudulent Messages were material misstatements.  (Ex. 4 Mills Statement of Offense at

6-7, 9 and (Ex. 2 A. Boling Statement of Offense at 2, 6).

   2.  *Defendants Misrepresentations Were Made in Connection With the Sale and
        Purchase of Securities*

During the "pump and dump" scheme Mills and others sold shares of the Stocks

at inflated prices and induced innocent investors to purchase shares.  These actions

satisfy the "in connection with the sale or purchase of securities" requirement.

   3.  *Defendants' Voicemails Were Made and Distributed With Scienter*

For purposes of Section 10(b) and Rule 10b-5, scienter is "a mental state

embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder,

*supra*, 425 U.S. at 194 n.12;  SEC v. Int'l Loan Network, supra, 770 F. Supp. at 694,

aff'd, 968 F.2d 1304 (D.C. Cir. 1992).  The conduct to which Defendants admitted was

done with scienter.  For example, Mills caused the dissemination of the Fraudulent

Messages containing multiple misrepresentations and omissions made by A. Boling.

(Ex. 4 Mills Statement of Offense at 3).  The Fraudulent Messages were designed to

deceive prospective investors into believing that they had inadvertently received a

confidential stock tip intended for a close friend of the person leaving the voicemail

message.  (Ex. 2 A. Boling Statement of Offense at 2 and Ex. 4 Mills Statement of

Offense at 1-2).  The Fraudulent Messages failed to disclose that Defendants would be

selling shares of the Stocks they were touting to the public.  Mills and R. Boling created

the scripts for the messages with the intent of fraudulently inducing prospective

investors into purchasing securities touted in the voicemails at inflated prices.  (Ex. 4

Mills Statement of Offense at 2).  Furthermore, A. Boling knew that the Fraudulent

Messages were intended to trick innocent investors into believing that they had received

a message meant for a friend whose number she had lost.  (Ex. 2 A. Boling Statement of Offense at 2).

### C. This Court Should Issue a Permanent Injunction and Ancillary Relief Against Defendants

#### 1. Permanent Injunction

Once liability under the securities laws has been established permanent injunctive relief should be granted upon a showing by the Plaintiff that there is a reasonable likelihood of further violations.  SEC v. First City Fin. Corp., 890 F.2d 1215, 1228 (D.C. Cir. 1989). In order to determine whether a reasonable likelihood of future violations exists, a court considers "whether a defendant's violation was isolated or part of a pattern, whether a defendant's violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future."  Id. Courts have held injunctive relief appropriate when only the first two factors are present. E.g., SEC v. Bilzerian, supra, 29 F.3d at 695.

Defendants' conduct in violation of Section 10(b) and Rule 10b-5 comprised a pattern, and was flagrant and deliberate, making injunctive relief appropriate.  The "pump and dump" scheme involved repetitive, wide-reaching, conduct perpetrated over a significant period of time.  Specifically, the fraudulent scheme encompassed six different stocks, caused significant impact on the market, and the Defendants and others profited from this scheme.  (Ex. 2 A. Boling Statement of Offense at 1 and Ex. 4 Mills Statements of Offense at 1, 2, 6, 8, 10).  The scripts for these voicemails were created by R. Boling and Mills to deceive unwary investors into buying shares of thinly-traded stocks.  (Ex. 4 Mills Statement of Offense at 2).  In each voicemail, A. Boling encouraged the recipient to call a cellular telephone number which R. Boling and Mills used to monitor the call volume.  (Ex.

- 12 -

2 A. Boling Statement of Offense at 12).  Mills and R. Boling used disposable cellular phones to communicate during the scheme to avoid detection by the authorities.  (Ex. 4 Mills Statement of Offense at 7-8, 11).  Defendants' "pump and dump" scheme was both carefully orchestrated and deliberate.  Defendants should be enjoined from further violating Section 10(b) and Rule 10b-5.

### 2. *Disgorgement and Prejudgment Interest*

Defendants should be ordered to pay disgorgement and prejudgment interest. Where a defendant has violated the securities laws, a court has the equitable power to order disgorgement of any unjust enrichment.  SEC v. First City Fin. Corp., *supra,* 890 F.2d at 1230; SEC v. Certain Unknown Purchasers (Santa Fe), 817 F.2d 1018, 1020 (2d Cir. 1987), cert. denied, 484 U.S. 1060 (1988).

The Court may order disgorgement, plus prejudgment interest, without holding an evidentiary hearing.  A hearing is not necessary "as long as [the Court] ensure[s] that there [is] a basis for the damages specified in the default judgment."  Carpenters Labor-Management Pension Fund v. Freeman-Carder LLC, No. 06-2069, 2007 U.S. Dist. LEXIS 55972, at *7 (D.D.C. Aug. 2, 2007) citing Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc., 109 F.3d 105, 111 (2d Cir. 1997)). The Plaintiff is required to prove only an amount of disgorgement reasonably approximate of the benefits or profits causally connected to the violation.  SEC v. First City Fin. Corp., *supra,* 890 F.2d at 1231.  Further, in cases where disgorgement calculations cannot be exact, the risk of uncertainty falls on the wrongdoer, whose illegal conduct created the uncertainty.  Id. at 1232.  A spreadsheet setting forth the prejudgment interest calculation by quarter is attached to Bellaire Decl. Ex.7.

- 13 -

Defendants are jointly and severally liable for disgorgement and prejudgment interest because they collaborated in the same pattern of conduct in pursuit of a common illegal scheme. "It is well established law that one who participates in any way in a conspiracy to defraud will be held jointly and severally liable with the conspirators." S.E.C. v. National Pacific Corp., et al., No. 76-1784, 1979 U.S. Dist. LEXIS 13150, at *19 (D.D.C. Aug. 7, 1979).

The Plaintiff seeks disgorgement in the amount of $171,983. This sum includes the following: (1) net proceeds of $86,750 from the sale of IVFH stock by Mills; (2) approximately $25,233 given to Mills as his share of the proceeds from the sale of MAUG stock; and (3) net cash payment of $60,000 received by R. Boling for his role in the scheme.[6]

This is an appropriate case for prejudgment interest to prevent the Defendants from realizing any financial benefit from their illegal "pump and dump" scheme. SEC v. Gerald H. Levine, et al., No. 99-2568, 2007 U.S. Dist. LEXIS 33686, at *44 (D.D.C. May 8, 2007). (To prevent a defendant from benefiting from an interest-free loan on his ill-gotten gains, the court requires him to pay interest on the disgorged amount.) This Court should consider the following factors in deciding whether to award prejudgment interest: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." SEC v. Kenton Capital, Ltd. et al., 69 F. Supp. 2d 1, 16 (D.D.C. 1998) citing SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1476 (2d Cir. 1996)

---

[6] The $40,000 previously disgorged by the telemarketer in SEC v. Michael O'Grady, et al., 05CV00868 (RJL) (D.D.C., May 3, 2005) has been deducted from the disgorgement Plaintiff seeks in this motion.

(quoting <u>Wickham Contracting Co. v. Local Union No. 3</u>, 955 F.2d 831, 833-34 (2d Cir. 1991)).

Should the Court award prejudgment interest, the Plaintiff requests that prejudgment interest be calculated using the rate employed by the Internal Revenue Service for tax underpayments. See 26 U.S.C. § 6621(a)(2). "Courts have approved the use of the IRS underpayment rate in connection with disgorgement." <u>SEC v. First Jersey Sec.</u>, *supra,* 101 F.3d at 1476. Additionally, Courts have ordered "defendants to pay prejudgment interest calculated through the date of the court's final judgment and order." <u>SEC v. Levine</u>, *supra,* at *45.

### 3. Civil Monetary Penalties

This Court should require each Defendant to pay a third tier monetary penalty. Section 21(d)(3) of the Securities and Exchange Act of 1934 authorizes the Plaintiff to seek, and the Court to impose, a third tier penalty if "(aa) the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (bb) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." These provisions authorize third tier civil penalties for each violation not to "exceed the greater of (I) $100,000 for a natural person . . . or (II) the gross amount of pecuniary gain to such defendant as a result of the violation . . . ."

Defendants' "pump and dump" scheme inarguably involved fraud, deceit, and manipulation. The Fraudulent Messages were received by tens of thousands of prospective investors. (Ex. 4 Mills Statement of Offense at 6, 8, 10). Mills and A. Boling admitted that there were more than fifty victims affected by their fraudulent

conduct. (Ex. 3 A. Boling Plea Agreement at 3 and Ex. 5 Mills Plea Agreement at 2).

Mills further admitted that the scheme resulted in losses of over one million dollars (Ex.

5 Mills Plea Agreement at 2) and A. Boling admitted that the scheme caused losses over

four hundred thousand dollars. (Ex. 3 A. Boling Plea Agreement at 3). Thus, the

scheme directly caused substantial losses to investors, and Defendants knew that their

nationwide scheme created a significant risk of such losses.

## CONCLUSION

For all the foregoing reasons, this Court should grant Plaintiff's motion for an

order granting summary judgment against the Defendants Anna August Boling, Jeffrey

Scott Mills and Direct Results of Sweetwater, LLC.


Dated: January 29, 2008
       Washington, DC


                              Respectfully Submitted,


                              /s/ Alan M. Lieberman
                              _____

                              Alan M. Lieberman
                              Andrea Bellaire
                              Attorneys for Plaintiff
                              U.S. Securities and Exchange Commission
                              100 F Street, NE
                              Washington, DC 20549
                              202.551.4474 (Lieberman)

## CERTIFICATE OF SERVICE

I hereby certify that, on January 29, 2008, I caused copies of the forgoing Motion for Summary Judgment Against defendants Anna August Boling, Jeffrey Scott Mills and Direct Results of Sweetwater, LLC and Memorandum of Points and Authorities, and the accompanying declaration of Andrea Bellaire dated January 29, 2008, the Plaintiff's Statement of Facts Not in Issue Pursuant to Local Civil Rule 56.1, and proposed Order, to be sent to the following parties, via Federal Express priority overnight prepaid and addressed to:

Anna August Boling through her attorney Joanne Roney Hepworth, 601 Pennsylvania Avenue, NW, Suite 900, South Building, Washington, DC 20004

Jeffrey Scott Mills through his attorney Mark David Hunter, 407 Lincoln Road, Suite 500, Miami Beach, FL 33139

<u>/s/ Andrea Bellaire</u>
Andrea Bellaire

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE PLAINTIFF, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Case No. 1:06CV01329 (RMC) |
| : | |
| RODERIC LEE BOLING III, : | |
| ANNA AUGUST BOLING, : | |
| JEFFREY SCOTT MILLS, and : | |
| DIRECT RESULTS OF SWEETWATER, LLC, : | |
| : | |
| Defendants. : | |
| : | |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF FACTS NOT IN ISSUE PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Civil Rule 56.1, Plaintiff Securities and Exchange Commission ("Plaintiff") contends that there is no genuine issue of fact to be tried as to the material facts set forth below. The Plaintiff submits this statement in support of its motion for summary judgment against Defendants Anna August Boling ("A. Boling"), Jeffrey Scott Mills ("Mills") and Direct Results of Sweetwater, LLC ("Direct Results"), (collectively referred to as "the Defendants").

### Pertinent Procedural History

1.     The Plaintiff's Complaint was filed on July 27, 2006, contemporaneously with a related criminal matter, United States of America v. Jeffrey S. Mills, Roderic L. Boling and Anna Boling, 06CR228 (ESH) (July 27, 2006), (the "Criminal Action"). (Civil Docket Number 1 and Criminal Action Docket Number 2).

2.      On July 3, 2007, the Defendants and Roderic Lee Boling ("R. Boling") pled guilty before the Honorable Ellen Segal Huvelle. (Ex. 1 Criminal Plea Transcript at 39, 52-53).

3.      The factual basis for the defendants' guilty pleas involves the same core allegations as Plaintiff's Complaint.  (Ex. 2 A. Boling Statement of Offense at 1; Ex. 3 A. Boling Plea Agreement at 2; Ex. 4 Mills Statement of Offense at 1; and Ex. 5 Mills Plea Agreement at 1).

4.      A. Boling pled guilty to Misprision of a Felony (Securities Fraud) in violation of 18 U.S.C. § 4, and 15 U.S.C. § 78j(b) and 78ff.  (Ex. 2 A. Boling Statement of Offense at 1 and Ex. 3 A. Boling Plea Agreement at 2).

5.      Mills pled guilty to Conspiracy to Commit Securities Fraud and Wire Fraud in violation of 18 U.S.C. § 371, and Securities Fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff.  (Ex. 4 Mills Statement of Offense at 1 and Ex. 5 Mills Plea Agreement at 1).

6.      On July 5, 2007, the Defendants' Plea Agreements and Statements of Offense were entered by the Court. (Criminal Action Docket Numbers 131, 133, 137-138).

**The Fraudulent Scheme**

7.      Defendants and co-defendant R. Boling, engaged in a "pump and dump" scheme to defraud the public through the nationwide broadcasting of fraudulent voicemail messages (the "Fraudulent Messages") touting stocks.  (Bellaire Decl. Ex. 1 Transcribed Fraudulent Messages).

8.      The Fraudulent Messages were intended to cause each recipient of a pre-recorded message to believe that he had been mistakenly given a "hot" stock tip intended for a

2

friend of the caller. (Ex. 2 A. Boling Statement of Offense at 2 and Ex. 4 Mills Statement of Offense at 1-2).

9.      The scheme was designed to artificially inflate the price and demand of the following companies' stock to induce investors to purchase shares of the stock: American Multiplexer Corp. ("AMUT"), Donini, Inc ("DNNI"), 5G Wireless Communications, Inc. ("FGWC"), Innovative Food Holdings, Inc. ("IVFH"), Maui General Store, Inc. ("MAUG), or Power3 Medical Products, Inc. ("PWRM") (collectively referred to as the "Stocks"). (Ex. 2 A. Boling Statement of Offense at 1 and Ex. 4 Mills Statements of Offense at 1).[1]

10.     The Fraudulent Messages were distributed to the answering machines and voicemail systems of tens of thousands of persons. (Ex. 4 Mills Statement of Offense at 6, 8, 10). The trading volume of the touted stocks was increased by approximately 1,500% in the aggregate and the share prices of the touted stocks were increased in the combined amount of approximately $179 million in market capitalization.

11.     There were more than fifty victims affected by this fraudulent scheme (Ex. 3 A. Boling Plea Agreement at 3 and Ex. 5 Mills Plea Agreement at 2) and the financial losses range from four hundred thousand dollars to one million dollars.[2]

12.     The scheme was designed to enable Mills and other insiders to profit by selling shares of the touted stocks at the fraudulently inflated prices. (Ex. 4 Mills Statement of Offense at 2).

---

[1] AMUT is not included in the Criminal Action.
[2] This spread is referenced in Ex. 5 Mills Plea Agreement at 2 and Ex. 3 A. Boling Plea Agreement at 3.

**Mills' Role in the Scheme**

13.     Mills was the organizer, manager, leader and supervisor of the Fraudulent Message scheme.  (Ex. 4 Mills Statement of Offense at 3).

14.     In July and August 2004, Mills was hired to promote five of the six Stocks in return for stock or cash or both.  Mills recruited R. Boling to participate in the fraudulent scheme.  (Ex. 4 Mills Statement of Offense at 5).

15.     Mills and R. Boling knew that individuals who had hired them to promote the Stocks planned to sell the Stocks into the market during the time that Mills and R. Boling were going to disseminate the Fraudulent Messages touting the Stocks.  (Ex. 4 Mills Statement of Offense at 6).

16.     Mills and R. Boling created the scripts for the Fraudulent Messages with the intent of fraudulently inducing prospective investors to purchase at inflated prices the Stocks touted in the voicemails.  (Ex. 4 Mills Statement of Offense at 2).  Mills knew that the Fraudulent Messages were materially deceptive.  (Ex. 4 Mills Statement of Offense at 6-7, 9).

17.     Mills directed R. Boling to have a woman record the Fraudulent Messages.  (Ex. 4 Mills Statements of Offense at 6, 8, 9-10).

**A. Boling's Role in the Scheme**

18.     At the direction of R. Boling, A. Boling recorded at least 26 different Fraudulent Messages.  She knew the scripted messages contained material misrepresentations and falsehoods and would be distributed to hundreds of thousands of households.  (Ex. 2 A. Boling Statement of Offense at 2, 6).  A. Boling further understood that her voicemails

would increase the Stocks trading volume and price. (Ex. 2 A. Boling Statement of Offense at 12).

19.    A. Boling created the belief in the recipients that they had received a voicemail message mistakenly dialed to their phone. (Ex. 2 A. Boling Statement of Offense at 2).

20.    A. Boling used a false name in each of the Fraudulent Messages and misrepresented that the cellular phone numbers were her own. A. Boling knew the cellular phone numbers she left in the Fraudulent Messages were to pre-paid disposable cellular telephones ("Disposable Phones"). (Ex. 2 A. Boling Statement of Offense at 12).

21.    The Disposable Phones were purchased by Mills. (Ex. 4 Mills Statement of Offense at 7-8). After Mills' home was searched by the criminal authorities, Mills, R. Boling and other insiders bought additional Disposable Phones to protect their phone communications with each other from detection. (Ex. 4 Mills Statement of Offense at 11).

22.    A. Boling knew R. Boling and Mills, or others involved in the fraudulent scheme were monitoring the call volume on the Disposable Phones. (Ex. 2 A. Boling Statement of Offense at 12).

23.    A. Boling knew R. Boling was hired by Mills to promote the Fraudulent Messages and that her then-husband and sole financial provider, R. Boling, would be compensated for his role in the scheme. (Ex. 2 A. Boling Statement of Offense at 2).

24.    A. Boling coached her relatives to provide false information to the grand jury. A. Boling believing that her mother and sister would be questioned before the grand jury regarding whether they were able to identify her voice on the Fraudulent Messages,

5

played one of the Fraudulent Messages for them and told them that she did not record the Fraudulent Messages.  (Ex. 2 A. Boling Statement of Offense at 13-14).

**The Ill-gotten Gains**

25.    Mills received 250,000 shares of IVFH stock from an insider as payment for his role in the scheme.  (Ex. 4 Mills Statement of Offense at 2 and Bellaire Decl. Ex. 3 Letter Instructing Transfer of IVFH Shares to Direct Results).

26.    During the time the Fraudulent Messages touting IVFH stock were broadcast Mills sold 220,000 IVFH shares at inflated prices.  (Ex. 4 Mills Statement of Offense at 2).  Mills generated proceeds of $86,750 from these sales.  (Bellaire Decl. Ex. 4 Direct Results' SunState Equity Trading, Inc., Account Statement and Bellaire Decl. Ex. 5 Chart summarizing these transactions).

27.    Mills also received two checks totaling $25,233 on August 2, 2004 and August 6, 2004, in proceeds from the sale of MAUG shares during the time period that investors were fraudulently induced to purchase MAUG stock.  (Ex. 4 Mills Statement of Offense at 2; Bellaire Decl. Ex. 6 Direct Results' SunTrust Bank Account Statement; and Bellaire Decl. Ex. 7 Checks in the amount of $9,833 and $15,400 for a total of $25,233).

28.    R. Boling, Mills and the telemarketer, who were hired by R. Boling to broadcast the Fraudulent Messages, traveled to a Gulfport, Mississippi casino to collect payment for their involvement in the scheme.  Mills met an insider who hired him to promote PWRM in the casino parking lot where he received $100,000.  Mills put the $100,000 in a duffel bag and thereafter gave the bag containing the $100,000 to R. Boling.  R. Boling took $10,000 from the bag, which he gave to the telemarketer; he also gave the telemarketer several thousand dollars worth of chips.  The next day, R. Boling gave the

telemarketer additional cash, and kept in excess of $35,000 for himself. (Ex. 4 Mills

Statement of Offense at 11). The telemarketer received a total of approximately $40,000

from R. Boling which has been disgorged by the telemarketer in his settlement with the

Plaintiff.[3]

29.    In addition to other relief, the Plaintiff seeks disgorgement in the amount of

$171,983. This sum includes the following: (1) net proceeds of $86,750 from the sale of

IVFH stock by Mills; (2) approximately $25,233 given to Mills as his share of the

proceeds from the sale of MAUG stock; and (3) net cash payment of $60,000 received

by R. Boling for his role in the scheme.


Dated:  January 29, 2008
        Washington, DC


                          /s/ Alan M. Lieberman
                          _____
                          Alan M. Lieberman
                          Andrea Bellaire
                          Attorneys for Plaintiff
                          U.S. Securities and Exchange Commission
                          100 F Street, NE
                          Washington, DC 20549
                          202.551.4474 (Lieberman)

---

[3] SEC v. Michael O'Grady, et al., 05CV00868 (RJL) (D.D.C., May 3, 2005). The telemarketer also pled guilty to obstruction of justice charges stemming from the fraudulent scheme. United States of America v. Michael O'Grady, 05CR119 (ESH) (D.D.C., May 3, 2005).

7